Christine P. Sun (SBN 218701)
Abre' Leann Conner (SBN 306024)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA, INC.
39 Drumm Street
San Francisco, California 94111
T: (415) 621-2493
F: (415) 255-8437
*csun@aclunc.org*
*aconner@aclunc.org*

Nusrat J. Choudhury*
Joshua David Riegel*
Hugh Handeyside*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street—18th Floor
New York, New York 10004
T: (212) 549-2500
F: (212) 549-2654
*nchoudhury@aclu.org*
*jriegel@aclu.org*
*hhandeyside@aclu.org*

*Attorneys for Plaintiffs*

*Admission pro hac vice pending

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTHERN CALIFORNIA
SAN FRANCISCO-OAKLAND DIVISION**

| | |
|---|---|
| CENTER FOR MEDIA JUSTICE; AMERICAN CIVIL LIBERTIES UNION; and AMERICAN CIVIL LIBERTIES UNION FOUNDATION,<br><br>*Plaintiffs*,<br><br>v.<br><br>FEDERAL BUREAU OF INVESTIGATION; and U.S. DEPARTMENT OF JUSTICE,<br><br>*Defendants*. | Case No. _____<br><br>**COMPLAINT FOR INJUNCTIVE RELIEF FOR VIOLATION OF THE FREEDOM OF INFORMATION ACT** |

**PRELIMINARY STATEMENT**

1.  The United States has a long and sordid history of government surveillance and targeting of Black people and Black-led organizations for the purpose of intimidating and

-1-
COMPLAINT FOR INJUNCTIVE RELIEF

disrupting their advocacy against white supremacy and police violence against Black communities. In the early Twentieth Century, the government engaged in extra-judicial surveillance of Black activists, including Ida B. Wells and Marcus Garvey, labeling them "race agitators."  In the 1950s and 1960s, through the notorious Counterintelligence Program ("COINTELPRO"), the Federal Bureau of Investigation ("FBI") conducted covert activities against Martin Luther King, Jr. and the Southern Christian Leadership Conference, leaders of the Student Nonviolent Coordinating Committee and the Black Panther Party, el-Hajj Malik el-Shabazz (previously known as "Malcolm X"), Gloria Richardson, Robert F. Williams, Ella Baker, and other Black people involved in the civil rights movement.  Similarly, in the late 1960s and 1970s, the FBI surveilled and investigated Black-owned bookstores on the grounds that the stores were purportedly centers of extremism.  And even as recently as 2009, the FBI tracked population increases among Black people in Georgia under the guise of learning about a purported terrorist threat from "Black Separatist" groups.

2. Against the backdrop of visible and growing opposition to police violence that particularly targets Black people, this lawsuit seeks to vindicate the right of the public to know about the most recent iteration of the FBI's wrongful surveillance of Black people and Black-led organizations who dare to challenge racialized police violence and other forms of racial injustice in this country.  In this Freedom of Information Act ("FOIA") case, the Center for Media Justice ("CMJ"), the American Civil Liberties Union, and the American Civil Liberties Union Foundation (together "ACLU") (collectively "Plaintiffs") challenge the government's failure to promptly release documents pertaining to the FBI's Intelligence Assessment titled "Black Identity Extremists Likely Motivated to Target Law Enforcement Officers" (the "Assessment").  Although there has been widespread attention and concern that the "Black Identity Extremist" ("BIE") designation is not based on evidence and is used by law enforcement to improperly surveil, investigate, and prosecute Black people, including activists, and Black-led organizations, the details of how the Assessment came into existence, its uses, and to whom it has been disseminated and for what purposes have been shrouded in secrecy.

-2-
COMPLAINT FOR INJUNCTIVE RELIEF

3. On October 31, 2018, Plaintiffs filed a FOIA request ("the Request") seeking the release of records concerning the Assessment and the FBI's surveillance of Black people and Black-led organizations on the basis of a purported shared ideology.

4. The FBI has failed to fulfill its obligation to make promptly available the requested information. The FBI refused to search for certain records responsive to the Request, asserting that the Request "does not contain enough descriptive information to permit a search" for those categories of records. Although the FBI disclosed redacted documents in response to a subset of the Request seeking records about public and Congressional inquiries or reactions to the Assessment, the information disclosed is heavily redacted and incomplete, suggesting that the FBI continues to improperly withhold responsive information.

5. Plaintiffs are entitled to the records they seek. These records will critically contribute to public understanding of the FBI's basis for identifying a so-called "Black Identity Extremist" threat and its formulation and use of the Assessment, including as pretext for improperly surveilling and criminally prosecuting Black people and Black-led organizations for constitutionally protected activity.

6. Plaintiffs seek an injunction under 5 U.S.C. § 552 requiring Defendants to conduct a reasonable search for documents responsive to the Request, to make the requested records promptly available to Plaintiffs, and to justify the withholding of any information with detailed and specific justifications as to why claimed FOIA exemptions apply to the records sought. Plaintiffs also seek an order enjoining Defendants from assessing fees for the processing of the Request and requiring Defendants to process the Request on an expedited schedule.

**JURISDICTION**

7. This Court has subject-matter jurisdiction over this action and personal jurisdiction over the parties under 5 U.S.C. §§ 552(a)(4)(A)(vii), (4)(B) and (6)(E)(iii). This Court also has jurisdiction over this action under 28 U.S.C. § 1331 and 5 U.S.C. §§ 701–706.

**VENUE AND INTRADISTRICT ASSIGNMENT**

8. Venue is proper in this District under 5 U.S.C. § 552(a)(4)(B).

9. Under Local Rule 3-2(c) and (d), assignment to the San Francisco-Oakland Division is proper because a substantial portion of the events giving rise to this action occurred in this District and Division and because Plaintiff CMJ is headquartered in Oakland.

**PARTIES**

10. Plaintiff Center for Media Justice is a national, non-profit, 501(c)(3) organization dedicated to democratizing the economy, government, and society through policies and practices that ensure democratic media ownership, fundamental communication rights, universal media and technology access, and meaningful, accurate representation within news and popular culture for communities of color, low-income families, low-wage workers, LGBT communities, women, and all those whose voices are raised, but remain unheard. CMJ includes a network of nearly one hundred affiliate organizations, over seventy-five percent of which are local, regional, or statewide social-justice organizations based in under-represented communities, making CMJ the largest racial-justice network for media and technology rights, access, and representation in the United States. Through research, the publishing and dissemination of reports, trainings, and strategic convenings on government surveillance of communities of color and other issues, CMJ seeks to build a movement for a more just and participatory media and digital world, racial justice, economic equity, and human dignity. CMJ is incorporated in the State of California and has its principal place of business in Oakland.

11. Plaintiff American Civil Liberties Union is a national non-profit and non-partisan, 501(c)(4) organization with more than four million members, activists, and supporters dedicated to the constitutional principles of liberty and equality. The American Civil Liberties Union is committed to ensuring that the United States government complies with the Constitution and laws of this country, including its international legal obligations, in matters that affect civil liberties and human rights. The American Civil Liberties Union is also committed to principles of transparency and accountability in government, and seeks to ensure that the American public is informed about the conduct and integrity of its government in matters that affect civil liberties, human rights, and public trust in government. Obtaining information about governmental activity, analyzing that

information, and widely publishing and disseminating it to the press and the public is a critical and substantial component of the American Civil Liberties Union's work and one of its primary activities. The American Civil Liberties Union is incorporated in New York State and has its principal place of business in New York City.

12. Plaintiff American Civil Liberties Union Foundation is a separate 501(c)(3) organization that educates the public about civil liberties and employs lawyers who provide legal representation free of charge in cases involving civil rights and civil liberties. It is incorporated in New York State and has its principal place of business in New York City.

13. Defendant Federal Bureau of Investigation is a component of the U.S. Department of Justice ("DOJ"). It is headquartered in Washington, D.C., and has field offices throughout the country, including in San Francisco, California.

14. Defendant DOJ is a Department of the Executive Branch of the U.S. government and an agency within the meaning of 5 U.S.C. § 552(f)(1). The DOJ is headquartered in Washington, D.C., with offices all over the country, including in San Francisco, California.

**FACTUAL BACKGROUND**

15. On October 6, 2017, Foreign Policy published an article disclosing the existence of an FBI Intelligence Assessment titled "Black Identity Extremists Likely Motivated to Target Law Enforcement Officers."[1] The Assessment was disseminated to at least 18,000 law enforcement agencies across the country.[2]

16. The Assessment contains troubling revelations about the FBI's targeting of Black people for surveillance, investigation, and prosecution based on conclusory allegations that a group of so-called "Black Identity Extremists" exists and poses a public safety threat. The Assessment

---

[1] Jana Winter & Sharon Weinberger, *The FBI's New U.S. Terrorist Threat: Black Identity Extremists*, Foreign Policy (Oct. 6, 2017), *available at* https://foreignpolicy.com/2017/10/06/the-fbi-has-identified-a-new-domestic-terrorist-threat-and-its-black-identity-extremists/.

[2] Kate Irby, *White and Far-Right Extremists Kill More Cops, But FBI Tracks Black Extremists More Closely, Many Worry*, McClatchy (Jan. 25, 2018), *available at* https://www.mcclatchydc.com/news/nation-world/national/article196423174.html.

asserts that six isolated incidents of violence against police officers by Black people purportedly demonstrate the existence of a shared ideology motivating violence against law enforcement.  The Assessment's creation of a "Black Identity Extremist" designation appears to wrongly group together Black people who, in the FBI's own words, "perceive[ ] racism and injustice in American society."

17. The Assessment also discloses the FBI's focus on First Amendment protected activity in determining who is a so-called "Black Identity Extremist."  The Assessment demonstrates that the FBI uses social media surveillance and looks at an individual's associations, what online search terms the individual uses, and what online content the individual may "like[ ]" when determining whether a person is a so-called "Black Identity Extremist."  The Assessment further claims that "advoca[cy] for violence against law enforcement," "violent anti-white rhetoric," and "affiliations with others in both the [Black Separatist Extremist] and sovereign citizen extremist movements" are purportedly "[p]ossible indicators" that an individual presents a "violent threat to law enforcement."  But targeting Black people because of a belief in "Black identity" or protected speech, association, or protest—including activism to counter white supremacy and police violence—raises grave civil rights, civil liberties, and human rights concerns because it could be based on, or lead to, illegal racial profiling and violation of First Amendment rights.

18. The FBI's creation of a "Black Identity Extremist" threat classification adds to the long list of terms the FBI has historically used in attempts to group unconnected Black people together for the purpose of surveillance, infiltration, and disruption of their racial justice advocacy.  The Assessment itself notes that it builds from prior bulletins about so-called "Black Separatist Extremists."  Black-led organizations, civil rights and civil liberties advocates, and media have recognized that the FBI's use of resources to target so-called "Black Identity Extremists" appears to build on a shameful history of unlawful surveillance and efforts to discredit and disrupt the advocacy of Black activists and Black-led organizations, including those involved in the civil rights movement of the 1950s and 1960s.

19. In the days after it became public, the Assessment garnered substantial public and media attention. News outlets and advocacy organizations reported that the term "Black Identity Extremists" appears to be entirely new, and suggested that the FBI created the term to justify surveillance of, and other government action against, Black people, including activists.[3] Some law enforcement have confirmed that no group of so-called "Black Identity Extremists" exists.[4]

20. Since its disclosure, the Assessment has generated significant public concern about racial bias infecting the FBI's priorities and use of resources. The majority of individuals who shot and killed law enforcement officers in 2016 are white.[5] An FBI database revealed that "[m]ore white offenders than black offenders killed police between 1980 and 2013."[6] And government reports show that white supremacists were responsible for nearly seventy-five percent of deadly extremist attacks between 2001 and 2016.[7] The FBI's issuance of the Assessment in August 2017—at a time of growing public concern about violence by white supremacists—has sparked criticism that the FBI provides insufficient attention to white supremacist violence while choosing

---

[3] *See, e.g.*, Grant Miller, *The FBI's 'Black Identity Extremist' Classification Is As Absurd As 'Reverse Racism,'* Huffington Post (Oct. 10, 2017), *available at* https://www.huffingtonpost.com/entry/black-identity-extremism-the-new-reverse-racism_us_59dc2d88e4b0a1bb90b83095; Andrew Cohen, *The FBI's New Fantasy: 'Black Identity Extremists,'* Brennan Center for Justice (Oct. 11, 2017), *available at* https://www.brennancenter.org/blog/fbi-new-fantasy-black-identity-extremists; Sam Levin, *FBI Terrorism Unit Says 'Black Identity Extremists' Pose a Violent Threat*, The Guardian (Oct. 7, 2017), *available at* https://www.theguardian.com/us-news/2017/oct/06/fbi-black-identity-extremists- racial-profiling.

[4] Press Release, National Organization of Black Law Enforcement Executives, NOBLE Expresses Concern Over the Black Identity Extremists FBI Assessment (Nov. 27, 2017), *available at* http://noblenational.org/wp-content/uploads/2018/01/FBI-Black-Identity-Extremists-NOBLE-Press-Statement.pdf.

[5] Shaun King, *White Men Killed More American Police Than Any Other Group This Year, But Conservatives Won't Address the Facts*, New York Daily News (May 11, 2016), a*vailable at* https://www.nydailynews.com/news/national/king-cops-killed-white-men-conservatives-silent-article-1.2632965.

[6] Michelle Ye Hee Lee, *Are Black or White Offenders More Likely to Kill Police?*, Washington Post (Jan. 9, 2015), *available at* https://www.washingtonpost.com/news/fact-checker/wp/2015/01/09/are-black-or-white-offenders-more-likely-to-kill-police/?noredirect=on&utm_term=.b767d8bd8b4b.

[7] U.S. Gov. Accountability Office, *Countering Violent Extremism* 28–34 (2017).

COMPLAINT FOR INJUNCTIVE RELIEF

instead to designate Black people who seek to remedy racial injustice and hold views about Black identity a domestic terrorist threat.[8] Media have also reported public concern that the FBI is misallocating investigative resources to surveil Black people, including activists associated with the Black Lives Matter ("BLM") movement, based on the creation of a specious and unsupported BIE threat designation.[9]

21. Public concern that law enforcement created and use the "Black Identity Extremist" classification to improperly surveil, investigate, discredit, and prosecute Black people has only mounted since the disclosure of the Assessment. There has been significant public concern as to whether a Texas man, Rakem Balogun, is the first Black activist arrested due to surveillance conducted under the Assessment. In May 2018, a federal judge in Texas dismissed the one-count indictment charging Mr. Balogun with illegal gun ownership and ordered his release after five months of pre-trial detention while the federal government tried—and ultimately failed—to prosecute him.[10] FBI agents investigating "domestic terrorism" began monitoring Mr. Balogun after he participated in a rally in March 2015 protesting law enforcement and made Facebook posts expressing solidarity with a Black man who allegedly killed police officers in Texas.[11] Mr. Balogun co-founded two groups committed to opposing police brutality, advocating for the rights of Black

---

[8] *See, e.g.*, Lincoln Anthony Blades, *Why the FBI's "Black Identity Extremist" Classification Is Dangerous*, Teen Vogue (Apr. 30, 2018), a*vailable at* https://www.teenvogue.com/story/why-the-fbis-black-identity-extremist-classification-is-dangerous.

[9] *See, e.g.*, *id.*; Cohen, *supra* note 3; Levin, *supra* note 3.

[10] Sam Levin, *Black Activist Jailed for his Facebook Posts Speaks Out About Secret FBI Surveillance*, The Guardian (May 11, 2018), a*vailable at* https://www.theguardian.com/world/2018/may/11/rakem-balogun-interview-black-identity-extremists-fbi-surveillance; *see also* Nicole Hemmer, *The Government Prosecution of a "Black Identity Extremist" Fell Apart. Meanwhile, White Supremacists Are on the March*, Vox (May 19, 2018), a*vailable at* https://www.vox.com/the-big-idea/2018/5/18/17368328/black-identity-extremist-fbi-klan-white-supremacy-black-lives-matter-balogun; Colin Kalmbacher, *The FBI Is Now Apparently Relying on InfoWars for Information to Prosecute Black Activists*, Law & Crime (May 12, 2018), *available at* https://lawandcrime.com/race-relations/the-fbi-is-now-apparently-relying-on-infowars-for-information-to-prosecute-black-activists/.

[11] *See* Levin, *supra* note 10.

gun owners, coordinating meals for the homeless, and providing self-defense classes.[12] Media reports raise concern that the language used by the prosecution in Mr. Balogun's case resembles the language in the Assessment, suggesting that the surveillance and prosecution of Balogun stemmed from the FBI's designation of him as a so-called "Black Identity Extremist."[13]

22. Public concern about the Assessment has converged with troubling reports about federal, state, and local law enforcement surveillance of Black activists associated with the BLM movement. In August 2018, BLM activists in Memphis, Tennessee learned that the Memphis Police Department acted under the direction of the Department of Homeland Security to use social media platforms to spy on BLM activists in 2016 and 2017.[14] Accessing both public and private Facebook posts, the police tracked BLM activists, their social media contacts, and, in at least once case, an activist's spouse, according to documents recently obtained by the ACLU.[15] Memphis police used this information to prepare joint intelligence briefs, which were shared with the Shelby County sheriff and government officials, the county school district, the Tennessee Department of Homeland Security, the U.S. Department of Homeland Security, the U.S. Department of Justice, the U.S. Military, the Memphis municipal utility company, the regional utility company, and private companies, such as FedEx and Autozone.[16] Similarly, police departments throughout

---

[12] *Id.*

[13] *See id.*

[14] Sam Fulwood III, *Newly Released Documents Reveal Memphis Police Have Been Spying on Black Lives Matter Activists*, ThinkProgress (Aug. 1, 2018), a*vailable at* https://thinkprogress.org/memphis-police-spy-on-black-lives-matter-activists-facebook-916e5d188e7c/; *see also* Rashad Robinson, *The Federal Government's Secret War on Black Activists*, American Prospect (April 4, 2018), *available at* https://prospect.org/article/federal-governments-secret-war-on-black-activists.

[15] Fulwood, *supra* note 14.

[16] Brentin Mock, *Memphis Police Spying on Activists is Worse Than we Thought*, CityLab (July 27, 2018), *available at* https://www.citylab.com/equity/2018/07/memphis-police-spying-on-activists-is-worse-than-we-thought/566264/.

California currently use, and have used in the past, software programs marketed to surveil and track the social media activity of activists and protestors, including Black activists.[17]

23. Members of Congress have also voiced concern that the government is unlawfully spying on Black people under the Assessment's guidance. In November 2017, shortly after disclosure of the FBI's "Black Identity Extremists" Assessment, Congressional Black Caucus Chairman Cedric Richmond denounced the BIE label as "inaccurate" and expressed concern that it would be used to target BLM activists.[18] Representative Karen Bass also raised concerns that the Assessment would lead to wrongful surveillance and harassment of BLM activists in a manner akin to FBI targeting of racial justice activists through COINTELPRO.[19]

24. In March 2018, members of Congress convened a hearing to discuss the BIE designation, at which Representative Bass criticized the Assessment, noting that the term "Black Identity Extremist" "could be applied to 'all protesters demonstrating for an end to police violence against black people.'"[20] She demanded a "total retraction" of the Assessment and criticized the BIE designation for improperly grouping together any individuals who have a sense of "Black identity."[21]

25. The Congressional Black Caucus has asked FBI Director Christopher Wray to rescind the Assessment.[22] But at the time of this filing, he has not committed to doing so.

---

[17] Megan Rose Dickey, *Police Are Increasingly Using Social Media Surveillance Tools*, TechCrunch (Sept. 23, 2016), a*vailable at* https://techcrunch.com/2016/09/23/police-are-increasingly-using-social-media-surveillance-tools/.

[18] Fulwood, *supra* note 14.

[19] *See* Blades, *supra* note 8.

[20] *U.S. Legislators Worried By FBI Term "Black Identity Extremists,"* Al Jazeera (Mar. 20, 2018), a*vailable at* https://www.aljazeera.com/news/2018/03/legislators-worried-fbi-term-black-identity-extremist-180320195356667.html.

[21] *See* Nicholas Ballasy, *"Total Retraction" of FBI's "Black Identity Extremism" Report "Imperative," says Dem Congresswoman*, PJ Media (Apr. 8, 2018), *available at* https://pjmedia.com/news-and-politics/total-retraction-fbis-black-identity-extremism-report-imperative-says-dem-congresswoman/.

[22] Adam Goldman and Nicholas Fandos, *Lawmakers Confront F.B.I. Director Over Report on*

26. Because of the significant public interest in exposing the basis of the Assessment as well as its consequences, which include improper government surveillance of Black people and Black-led organizations, Plaintiffs seek the immediate searching, processing, and release of documents related to the Assessment. Only through access to these records can the public exercise its indispensable role in checking the vast powers of our government, including impermissible racial profiling and targeting of Black people and Black-led organizations on the basis of speech, association, or conduct protected by the First Amendment.

## THE FOIA REQUEST

27. On October 31, 2018, Plaintiffs submitted a request under the FOIA, 5 U.S.C.A. § 552, and the DOJ implementing regulations, 28 C.F.R. § 16.1, to Defendant FBI requesting records pertaining to the FBI's surveillance of Black people on the basis of a purported shared ideology.

28. The Request seeks three categories of records: (1) all records created since January 1, 2014, that use any of the following terms or abbreviations: "Black Identity Extremist" ("BIE"), "Black Nationalist" ("BN"), "Black Separatist" ("BS"), or "Black Supremacist Extremists" ("BSE"), Exhibit A at 5 (paragraph 1); (2) all records referencing, or created in response to, public and Congressional inquiries or reactions to the existence or contents of the FBI Intelligence Assessment titled "Black Identity Extremists Likely Motivated to Target Law Enforcement Officers," Exhibit A at 5 (paragraph 2); and (3) all records created since January 1, 2014, that reference "extremist" violence committed by Black people in the United States, including but not limited to individuals described as "Black Identity Extremists," "Black Nationalists," "Black Separatist Extremists," "Black Separatists," or "Black Supremacist Extremists," Exhibit A at 5 (paragraph 3).

## AGENCY RESPONSE

29. The FBI assigned two separate request numbers to two of the three record categories identified in the Request, and responded in two separate letters, each dated November 2, 2018. *See*

---

*Black Extremists*, N.Y. Times (Nov. 29, 2017), *available at* https://www.nytimes.com/2017/11/29/us/politics/fbi-black-identity-extremist-report.html.

1  Exhibit B (responding to paragraph 1 (Request No. NFP-102340)); Exhibit C (responding to
2  paragraph 3 (Request No. NFP-102341)) (collectively, the "Responses"). The FBI refused to
3  search for records responsive to paragraphs 1 and 3 of the Request, asserting that the Request "does
4  not contain enough descriptive information to permit a search." *See* Exhibit B at 1; Exhibit C at 1.

5      30. Plaintiffs received no response from Defendants to paragraph 2 of the Request,
6  which seeks records related to public and Congressional inquiries or reactions to the existence or
7  contents of the Assessment, until February 22, 2019. On that date, Plaintiffs received a cover letter
8  dated February 15, 2019, and an initial disclosure of heavily redacted records from Defendant FBI.
9  *See* Exhibit D (responding to paragraph 2 of the Request (Request No. 1387511-000)). The FBI's
10 cover letter indicated that the agency reviewed 552 pages of documents and released 320 pages with
11 information redacted under the FOIA Exemptions 5, 6, 7C, and 7E. *Id*. Neither the FBI's cover
12 letter nor the disclosure itself provide any description of the withheld information sufficient to
13 permit Plaintiffs to determine whether Defendants have properly withheld information under the
14 specified FOIA exemptions.

15     31. Defendants are improperly withholding records sought by Plaintiffs that are urgently
16 needed to inform public debate concerning unlawful FBI targeting of Black people and Black-led
17 organizations for surveillance, investigation, and prosecution.

## EXHAUSTION

19     32. Plaintiffs have exhausted all applicable administrative remedies with respect to
20 paragraphs 1 and 3 of the Request.

21     33. By letter dated January 22, 2019, Plaintiffs timely appealed the FBI's failure to
22 adequately search for records reasonably described in paragraphs 1 and 3 of the Request; its failure
23 to make those records promptly available; and the FBI's improper withholding of those documents.

24     34. The FBI's February 15, 2019, response to paragraph 2 of the Request is heavily
25 redacted and provides insufficient information to determine whether any of the redacted information
26 and withheld documents are properly kept secret under the FOIA. Defendants have not provided
27 any explanation for why exemptions to the FOIA permit withholding information from disclosure.
28

35. Additionally, the FBI's disclosure in response to paragraph 2 of the FOIA appears to be deficient on its face. Media reports detailed above show that the Congressional Black Caucus held a March 2018 hearing during which members of Congress raised concerns about the Assessment and government surveillance and investigations conducted under the so-called BIE designation. The FBI's disclosure of information in response to paragraph 2 of the Request, however, only includes e-mails between FBI and DOJ officials that were exchanged between August 2017 and December 2017. The absence of any internal e-mails or other agency records dated around the time of the March 2018 Congressional Black Caucus hearing raises serious concerns that the FBI is improperly withholding public records responsive to Plaintiffs' request for information related to public and Congressional inquiries or reactions to the Assessment.

**CAUSE OF ACTION**

36. Plaintiffs are entitled to injunctive relief with respect to the release and disclosure of the requested documents under 5 U.S.C. § 552(a)(4)(B) because the FBI continues to improperly deny the processing of agency records in violation of the FOIA. Plaintiffs will also suffer irreparable injury from, and have no adequate legal remedy for, the FBI's illegal withholding of and prolonged delay in production of government documents pertaining to the FBI's Assessment and surveillance of Black people, including activists, and Black-led organizations.

37. Defendants' failure to conduct a proper search for responsive records violates the FOIA, 5 U.S.C. § 552(a)(3)(C)–(D), and the corresponding agency regulations, 28 C.F.R. § 16.4(a).

38. Defendants' failure to release records responsive to Plaintiffs' Request violates the FOIA, 5 U.S.C. § 552(a), and the corresponding agency regulations, 28 C.F.R. § 16.1.

39. Defendants' failure to timely respond to Plaintiffs' Request violates the FOIA, 5 U.S.C. § 552(a)(6)(A), and the corresponding agency regulations, 28 C.F.R. § 16.6(b).

40. Defendants' failure to make promptly available the records sought by Plaintiffs' Request violates the FOIA, 5 U.S.C. § 552(a)(3)(A), and the corresponding agency regulations, 28 C.F.R. § 16.6(b).

41.     Defendants' improper withholding of information violates the FOIA, 5 U.S.C. § 552(a)(4)(B).

42.     Defendants' failure to expedite processing of responsive records violates the FOIA, 5 U.S.C. § 552(a)(6)(E), and corresponding agency regulations, 28 C.F.R. § 16.5(e).

43.     Defendants' failure to waive search fees violates the FOIA, 5 U.S.C. § 522(a)(4)(A)(ii)-(iii), and the corresponding agency regulations, 28 C.F.R. § 16.10(k).

## REQUEST FOR RELIEF

Plaintiffs respectfully request that this Court:

A.     Order Defendants to conduct a thorough search for all responsive records;

B.     Order Defendants to immediately process all requested records;

C.     Order Defendants to promptly disclose the requested records in their entirety and to make copies available to Plaintiffs;

D.     Enjoin Defendants from charging Plaintiffs fees for processing the Request;

E.     Enter a preliminary and permanent injunction against Defendants ordering the requested relief herein;

F.     Award Plaintiffs their litigation costs and reasonable attorneys' fees incurred in this action; and

G.     Grant such other relief as the Court may deem just and proper.

Dated: March 21, 2019

Respectfully Submitted,

 /s/  Christine P. Sun
Christine P. Sun (SBN 218701)
Abre' Leann Conner (SBN 306024)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
OF NORTHERN CALIFORNIA, INC.
39 Drumm Street
San Francisco, California 94111
T: (415) 621-2493
F: (415) 255-8437
*csun@aclunc.org*
*aconner@aclunc.org*

Nusrat J. Choudhury*
Joshua David Riegel*
Hugh Handyeside*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street—18th Floor
New York, New York 10004
T: (212) 549-2500
F: (212) 549-2654
*nchoudhury@aclu.org*
*jriegel@aclu.org*
*hhandeyside@aclu.org*

*Attorneys for Plaintiffs*

*Admission pro hac vice pending

-15-
COMPLAINT FOR INJUNCTIVE RELIEF