Christine P. Sun (SBN 218701)
Abre' Leann Conner (SBN 306024)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA, INC.
39 Drumm Street
San Francisco, California 94111
T: (415) 621-2493
F: (415) 255-8437
*csun@aclunc.org*
*aconner@aclunc.org*

Nusrat J. Choudhury
Mark J. Carter
Hugh Handeyside
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street—18th Floor
New York, New York 10004
T: (212) 549-2500
F: (212) 549-2654
*nchoudhury@aclu.org*
*mcarter@aclu.org*
*hhandeyside@aclu.org*

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO-OAKLAND DIVISION

| | |
|---|---|
| MEDIAJUSTICE; AMERICAN CIVIL LIBERTIES UNION; and AMERICAN CIVIL LIBERTIES UNION FOUNDATION,<br><br>*Plaintiffs*,<br><br>v.<br><br>FEDERAL BUREAU OF INVESTIGATION; and U.S. DEPARTMENT OF JUSTICE,<br><br>*Defendants*. | Case No. 4:19-cv-01465 (DMR)<br><br>**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF FOR VIOLATION OF THE FREEDOM OF INFORMATION ACT** |

## PRELIMINARY STATEMENT

1. The United States has a long and sordid history of government surveillance and targeting of Black people and Black-led organizations for the purpose of intimidating and disrupting their advocacy against white supremacy and police violence against Black communities. In the early Twentieth Century, the government engaged in extra-judicial surveillance of Black

activists, including Ida B. Wells and Marcus Garvey, labeling them "race agitators." In the 1950s and 1960s, through the notorious Counterintelligence Program ("COINTELPRO"), the Federal Bureau of Investigation ("FBI") conducted covert activities against Martin Luther King, Jr., and the Southern Christian Leadership Conference, leaders of the Student Nonviolent Coordinating Committee, and the Black Panther Party, in addition to el-Hajj Malik el-Shabazz (previously known as "Malcolm X"), Gloria Richardson, Robert F. Williams, Ella Baker, and other Black people involved in the civil rights movement. Similarly, in the late 1960s and 1970s, the FBI surveilled and investigated Black-owned bookstores on the grounds that the stores were purportedly centers of extremism. And even as recently as 2009, the FBI tracked population increases among Black people in Georgia under the guise of learning about a purported terrorist threat from "Black Separatist" groups.

2. Against the backdrop of visible and growing opposition to police violence that particularly targets Black people, this lawsuit seeks to vindicate the right of the public to know about the most recent iteration of the FBI's wrongful surveillance of Black people and Black-led organizations who dare to challenge racialized police violence and other forms of racial injustice in this country. In this Freedom of Information Act ("FOIA") case, MediaJustice, the American Civil Liberties Union, and the American Civil Liberties Union Foundation (together "ACLU") (collectively "Plaintiffs") challenge the government's failure to promptly release documents pertaining to the FBI's Intelligence Assessment titled "Black Identity Extremists Likely Motivated to Target Law Enforcement Officers" (the "Assessment"). Although there has been widespread attention and concern that the "Black Identity Extremist" ("BIE") designation is not based on evidence and is used by law enforcement to improperly surveil, investigate, and prosecute Black people, including activists, and Black-led organizations, the details of how the Assessment came into existence, its uses, and to whom it has been disseminated and for what purposes have been shrouded in secrecy.

3. On October 31, 2018, Plaintiffs filed a FOIA request (the "2018 Request") seeking the release of records concerning the Assessment and the FBI's surveillance of Black people and Black-led organizations on the basis of a purported shared ideology.

4. The FBI has failed to fulfill its obligation to make promptly available the information sought by the 2018 Request. The FBI refused to search for certain records responsive to the 2018 Request, asserting that the 2018 Request "does not contain enough descriptive information to permit a search" for those categories of records. Although the FBI disclosed redacted documents in response to a subset of the 2018 Request seeking records about public and Congressional inquiries or reactions to the Assessment, the information disclosed is heavily redacted and incomplete, suggesting that the FBI continues to improperly withhold responsive information.

5. In the more than nine months following Plaintiffs' submission of the 2018, public debate about the FBI's "BIE" designation has only continued. Consequently, on June 25, 2019, Plaintiffs submitted an additional FOIA request seeking more recent records concerning the Assessment and the FBI's surveillance of Black people and Black-led organizations on the basis of a purported shared ideology (the "2019 Request"). The 2019 Request seeks the same three categories of records as the 2018 Request but is limited to records created between April 19, 2019 and June 19, 2019.

6. The FBI has failed to fulfill its obligation to make promptly available the information sought by the 2019 Request. The FBI has not disclosed any records or otherwise responded to the 2019 Request in any substantive manner. The FBI thus continues to improperly withhold information in response to the 2019 Request.

7. Plaintiffs are entitled to the records they seek through the 2018 Request and the 2019 Request (collectively, "Requests"). These records will critically contribute to public understanding of the FBI's basis for identifying a so-called "Black Identity Extremist" threat and its formulation and use of the Assessment, including as pretext for improperly surveilling and criminally prosecuting Black people and Black-led organizations for constitutionally protected activity.

-3-
SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF
No. 4:19-cv-01465 (DMR)

8. Plaintiffs seek an injunction under 5 U.S.C. § 552 requiring Defendants to conduct a reasonable search for documents responsive to the Requests, to make the requested records promptly available to Plaintiffs, and to justify the withholding of any information with detailed and specific justifications as to why claimed FOIA exemptions apply to the records sought. Plaintiffs also seek an order enjoining Defendants from assessing fees for the processing of the Request and requiring Defendants to process the Requests on an expedited schedule.

## JURISDICTION

9. This Court has subject-matter jurisdiction over this action and personal jurisdiction over the parties under 5 U.S.C. §§ 552(a)(4)(A)(vii), (4)(B) and (6)(E)(iii). This Court also has jurisdiction over this action under 28 U.S.C. § 1331 and 5 U.S.C. §§ 701–706.

## VENUE AND INTRADISTRICT ASSIGNMENT

10. Venue is proper in this District under 5 U.S.C. § 552(a)(4)(B).

11. Under Local Rule 3-2(c) and (d), assignment to the San Francisco-Oakland Division is proper because a substantial portion of the events giving rise to this action occurred in this District and Division and because Plaintiff MediaJustice is headquartered in Oakland.

## PARTIES

12. Plaintiff MediaJustice, formerly known as "Center for Media Justice," is a national, non-profit, 501(c)(3) organization dedicated to democratizing the economy, government, and society through policies and practices that ensure democratic media ownership, fundamental communication rights, universal media and technology access, and meaningful, accurate representation within news and popular culture for communities of color, low-income families, low-wage workers, LGBT communities, women, and all those whose voices are raised, but remain unheard. MediaJustice includes a network of nearly one hundred affiliate organizations, over seventy-five percent of which are local, regional, or statewide social-justice organizations based in under-represented communities, making MediaJustice the largest racial-justice network for media and technology rights, access, and representation in the United States. Through research, the publishing and dissemination of reports, trainings, and strategic convenings on government surveillance of communities of color and other

issues, MediaJustice seeks to build a movement for a more just and participatory media and digital world, racial justice, economic equity, and human dignity. MediaJustice is incorporated in the State of California and has its principal place of business in Oakland.

13. Plaintiff American Civil Liberties Union is a national non-profit and non-partisan, 501(c)(4) organization with more than four million members, activists, and supporters dedicated to the constitutional principles of liberty and equality. The American Civil Liberties Union is committed to ensuring that the United States government complies with the Constitution and laws of this country, including its international legal obligations, in matters that affect civil liberties and human rights. The American Civil Liberties Union is also committed to principles of transparency and accountability in government, and seeks to ensure that the American public is informed about the conduct and integrity of its government in matters that affect civil liberties, human rights, and public trust in government. Obtaining information about governmental activity, analyzing that information, and widely publishing and disseminating it to the press and the public is a critical and substantial component of the American Civil Liberties Union's work and one of its primary activities. The American Civil Liberties Union is incorporated in New York State and has its principal place of business in New York City.

14. Plaintiff American Civil Liberties Union Foundation is a separate 501(c)(3) organization that educates the public about civil liberties and employs lawyers who provide legal representation free of charge in cases involving civil rights and civil liberties. It is incorporated in New York State and has its principal place of business in New York City.

15. Defendant Federal Bureau of Investigation is a component of the U.S. Department of Justice ("DOJ"). It is headquartered in Washington, D.C., and has field offices throughout the country, including in San Francisco, California.

16. Defendant DOJ is a Department of the Executive Branch of the U.S. government and an agency within the meaning of 5 U.S.C. § 552(f)(1). The DOJ is headquartered in Washington, D.C., with offices all over the country, including in San Francisco, California.

-5-
SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF
No. 4:19-cv-01465 (DMR)

# FACTUAL BACKGROUND

17. On October 6, 2017, Foreign Policy published an article disclosing the existence of an FBI Intelligence Assessment titled "Black Identity Extremists Likely Motivated to Target Law Enforcement Officers."[1] The Assessment was disseminated to at least 18,000 law enforcement agencies across the country.[2]

18. The Assessment contains troubling revelations about the FBI's targeting of Black people for surveillance, investigation, and prosecution based on conclusory allegations that a group of so-called "Black Identity Extremists" exists and poses a public safety threat. The Assessment asserts that six isolated incidents of violence against police officers by Black people purportedly demonstrate the existence of a shared ideology motivating violence against law enforcement. The Assessment's creation of a "Black Identity Extremist" designation appears to wrongly group together Black people who, in the FBI's own words, "perceive[ ] racism and injustice in American society."

19. The Assessment also discloses the FBI's focus on First Amendment protected activity in determining who is a so-called "Black Identity Extremist." The Assessment demonstrates that the FBI uses social media surveillance and looks at an individual's associations, what online search terms the individual uses, and what online content the individual may "like[ ]" when determining whether a person is a so-called "Black Identity Extremist." The Assessment further claims that "advoca[cy] for violence against law enforcement," "violent anti-white rhetoric," and "affiliations with others in both the [Black Separatist Extremist] and sovereign citizen extremist movements" are purportedly "[p]ossible indicators" that an individual presents a

---

[1] Jana Winter & Sharon Weinberger, *The FBI's New U.S. Terrorist Threat: Black Identity Extremists*, Foreign Policy (Oct. 6, 2017, 11:42 AM), https://foreignpolicy.com/2017/10/06/the-fbi-has-identified-a-new-domestic-terrorist-threat-and-its-black-identity-extremists/.

[2] Kate Irby, *White and Far-Right Extremists Kill More Cops, But FBI Tracks Black Extremists More Closely, Many Worry*, McClatchy (Jan. 25, 2018), https://www.mcclatchydc.com/news/nation-world/national/article196423174.html.

"violent threat to law enforcement." But targeting Black people because of a belief in "Black identity" or protected speech, association, or protest—including activism to counter white supremacy and police violence—raises grave civil rights, civil liberties, and human rights concerns because it could be based on, or lead to, illegal racial profiling and violation of First Amendment rights.

20. The FBI's creation of a "Black Identity Extremist" threat classification adds to the long list of terms the FBI has historically used in attempts to group unconnected Black people together for the purpose of surveillance, infiltration, and disruption of their racial justice advocacy. The Assessment itself notes that it builds from prior bulletins about so-called "Black Separatist Extremists." Black-led organizations, civil rights and civil liberties advocates, and media have recognized that the FBI's use of resources to target so-called "Black Identity Extremists" appears to build on a shameful history of unlawful surveillance and efforts to discredit and disrupt the advocacy of Black activists and Black-led organizations, including those involved in the civil rights movement of the 1950s and 1960s.

21. In the days after it became public, the Assessment garnered substantial public and media attention. News outlets and advocacy organizations reported that the term "Black Identity Extremists" appears to be entirely new, and suggested that the FBI created the term to justify surveillance of, and other government action against, Black people, including activists.[3] Some law enforcement have confirmed that no group of so-called "Black Identity Extremists" exists.[4]

---

[3] *See, e.g.*, Grant Miller, *The FBI's 'Black Identity Extremist' Classification Is As Absurd As 'Reverse Racism,'* Huffington Post (Oct. 10, 2017), https://www.huffingtonpost.com/entry/black-identity-extremism-the-new-reverse-racism_us_59dc2d88e4b0a1bb90b83095; Andrew Cohen, *The FBI's New Fantasy: 'Black Identity Extremists,'* Brennan Center for Justice (Oct. 11, 2017), https://www.brennancenter.org/blog/fbi-new-fantasy-black-identity-extremists; Sam Levin, *FBI Terrorism Unit Says 'Black Identity Extremists' Pose a Violent Threat*, The Guardian (Oct. 7, 2017), https://www.theguardian.com/us-news/2017/oct/06/fbi-black-identity-extremists- racial-profiling.

[4] Press Release, National Organization of Black Law Enforcement Executives, NOBLE Expresses Concern Over the Black Identity Extremists FBI Assessment (Nov. 27, 2017), http://noblenational.org/wp-content/uploads/2018/01/FBI-Black-Identity-Extremists-NOBLE-

22. Since its disclosure, the Assessment has generated significant public concern about racial bias infecting the FBI's priorities and use of resources. The majority of individuals who shot and killed law enforcement officers in 2016 are white.[5] An FBI database revealed that "[m]ore white offenders than black offenders killed police between 1980 and 2013."[6] And government reports show that white supremacists were responsible for nearly seventy-five percent of deadly extremist attacks between 2001 and 2016.[7] The FBI's issuance of the Assessment in August 2017—at a time of growing public concern about violence by white supremacists—has sparked criticism that the FBI provides insufficient attention to white supremacist violence while choosing instead to designate Black people who seek to remedy racial injustice and hold views about Black identity a domestic terrorist threat.[8] Media have also reported public concern that the FBI is misallocating investigative resources to surveil Black people, including activists associated with the Black Lives Matter ("BLM") movement, based on the creation of a specious and unsupported BIE threat designation.[9]

---

Press-Statement.pdf.

[5] Shaun King, *White Men Killed More American Police Than Any Other Group This Year, But Conservatives Won't Address the Facts*, New York Daily News (May 11, 2016), https://www.nydailynews.com/news/national/king-cops-killed-white-men-conservatives-silent-article-1.2632965.

[6] Michelle Ye Hee Lee, *Are Black or White Offenders More Likely to Kill Police?*, Washington Post (Jan. 9, 2015), https://www.washingtonpost.com/news/fact-checker/wp/2015/01/09/are-black-or-white-offenders-more-likely-to-kill-police/?noredirect=on&utm_term=.b767d8bd8b4b.

[7] U.S. Gov. Accountability Office, *Countering Violent Extremism* 28–34 (2017).

[8] *See, e.g.*, Lincoln Anthony Blades, *Why the FBI's "Black Identity Extremist" Classification Is Dangerous*, Teen Vogue (Apr. 30, 2018), https://www.teenvogue.com/story/why-the-fbis-black-identity-extremist-classification-is-dangerous; Trevor Aaronson, *FBI's Leniency Toward Border Vigilante Contrasts with Harsh Treatment of "Black Identity Extremist,"* The Intercept (July 7, 2019, 7:00 AM), https://theintercept.com/2019/07/07/fbi-border-vigilante-black-identity-extremist.

[9] *See, e.g.*, Blades, *supra* note 8; Cohen, *supra* note 3; Levin, *supra* note 3; Michael Harriot, *The FBI Admits Black Lives Matter Was Never a Threat*, The Root (June 11, 2019, 2:00 PM),

23. Public concern that law enforcement created and use the "Black Identity Extremist" classification to improperly surveil, investigate, discredit, and prosecute Black people has only mounted since the disclosure of the Assessment. There has been significant public concern as to whether a Texas man, Rakem Balogun, is the first Black activist arrested due to surveillance conducted under the Assessment.[10] In May 2018, a federal judge in Texas dismissed the one-count indictment charging Mr. Balogun with illegal gun ownership and ordered his release after five months of pre-trial detention while the federal government tried—and ultimately failed—to prosecute him.[11] FBI agents investigating "domestic terrorism" began monitoring Mr. Balogun after he participated in a rally in March 2015 protesting law enforcement and made Facebook posts expressing solidarity with a Black man who allegedly killed police officers in Texas.[12] Mr. Balogun co-founded two groups committed to opposing police brutality, advocating for the rights of Black gun owners, coordinating meals for the homeless, and providing self-defense classes.[13] Media reports raise concern that the language

---

https://www.theroot.com/the-fbi-admits-black-lives-matter-was-never-a-threat-i-1835417043.

[10] *See, e.g.*, Jacob Vaughn, *Dallas Black Activist May Be First Labeled 'Black Identity Extremist' by FBI*, Dallas Observer (July 31, 2019, 4:00 AM), https://www.dallasobserver.com/news/dallas-activist-rakem-balogun-may-be-first-targeted-under-fbis-new-black-identity-extremist-threat-label-11705688.

[11] Sam Levin, *Black Activist Jailed for his Facebook Posts Speaks Out About Secret FBI Surveillance*, The Guardian (May 11, 2018), https://www.theguardian.com/world/2018/may/11/rakem-balogun-interview-black-identity-extremists-fbi-surveillance; *see also* Nicole Hemmer, *The Government Prosecution of a "Black Identity Extremist" Fell Apart. Meanwhile, White Supremacists Are on the March*, Vox (May 19, 2018), https://www.vox.com/the-big-idea/2018/5/18/17368328/black-identity-extremist-fbi-klan-white-supremacy-black-lives-matter-balogun; Colin Kalmbacher, *The FBI Is Now Apparently Relying on InfoWars for Information to Prosecute Black Activists*, Law & Crime (May 12, 2018), https://lawandcrime.com/race-relations/the-fbi-is-now-apparently-relying-on-infowars-for-information-to-prosecute-black-activists/.

[12] *See* Levin, *supra* note 11.

[13] *Id*.

used by the prosecution in Mr. Balogun's case resembles the language in the Assessment, suggesting that the surveillance and prosecution of Balogun stemmed from the FBI's designation of him as a so-called "Black Identity Extremist."[14]

24. Public concern about the Assessment has converged with troubling reports about federal, state, and local law enforcement surveillance of Black activists associated with the BLM movement. In August 2018, BLM activists in Memphis, Tennessee learned that the Memphis Police Department acted under the direction of the Department of Homeland Security to use social media platforms to spy on BLM activists in 2016 and 2017.[15] Accessing both public and private Facebook posts, the police tracked BLM activists, their social media contacts, and, in at least once case, an activist's spouse, according to documents recently obtained by the ACLU.[16] Memphis police used this information to prepare joint intelligence briefs, which were shared with the Shelby County sheriff and government officials, the county school district, the Tennessee Department of Homeland Security, the U.S. Department of Homeland Security, the U.S. Department of Justice, the U.S. Military, the Memphis municipal utility company, the regional utility company, and private companies, such as FedEx and Autozone.[17] Similarly, police departments throughout California currently use, and have used in the past, software programs marketed to surveil and track the social media activity of activists and protestors, including Black activists.[18]

---

[14] *See id.*

[15] Sam Fulwood III, *Newly Released Documents Reveal Memphis Police Have Been Spying on Black Lives Matter Activists*, ThinkProgress (Aug. 1, 2018), https://thinkprogress.org/memphis-police-spy-on-black-lives-matter-activists-facebook-916e5d188e7c/; *see also* Rashad Robinson, *The Federal Government's Secret War on Black Activists*, American Prospect (April 4, 2018), https://prospect.org/article/federal-governments-secret-war-on-black-activists.

[16] Fulwood, *supra* note 15.

[17] Brentin Mock, *Memphis Police Spying on Activists is Worse Than we Thought*, CityLab (July 27, 2018), https://www.citylab.com/equity/2018/07/memphis-police-spying-on-activists-is-worse-than-we-thought/566264/.

[18] Megan Rose Dickey, *Police Are Increasingly Using Social Media Surveillance Tools*,

25. Members of Congress have also voiced concern that the government is unlawfully spying on Black people under the Assessment's guidance. In November 2017, shortly after disclosure of the FBI's "Black Identity Extremists" Assessment, Congressional Black Caucus Chairman Cedric Richmond denounced the BIE label as "inaccurate" and expressed concern that it would be used to target BLM activists.[19] Representative Karen Bass also raised concerns that the Assessment would lead to wrongful surveillance and harassment of BLM activists in a manner akin to FBI targeting of racial justice activists through COINTELPRO.[20] The Congressional Black Caucus has asked FBI Director Christopher Wray to rescind the Assessment.[21]

26. In March 2018, members of Congress convened a hearing to discuss the BIE designation, at which Representative Bass criticized the Assessment, noting that the term "Black Identity Extremist" "could be applied to 'all protesters demonstrating for an end to police violence against black people.'"[22] She demanded a "total retraction" of the Assessment and criticized the BIE designation for improperly grouping together any individuals who have a sense of "Black identity."[23]

---

TechCrunch (Sept. 23, 2016), https://techcrunch.com/2016/09/23/police-are-increasingly-using-social-media-surveillance-tools/.

[19] Fulwood, *supra* note 15.

[20] *See* Blades, *supra* note 8.

[21] Adam Goldman and Nicholas Fandos, *Lawmakers Confront F.B.I. Director Over Report on Black Extremists*, N.Y. Times (Nov. 29, 2017), https://www.nytimes.com/2017/11/29/us/politics/fbi-black-identity-extremist-report.html.

[22] *U.S. Legislators Worried By FBI Term "Black Identity Extremists,"* Al Jazeera (Mar. 20, 2018), https://www.aljazeera.com/news/2018/03/legislators-worried-fbi-term-black-identity-extremist-180320195356667.html.

[23] *See* Nicholas Ballasy, *"Total Retraction" of FBI's "Black Identity Extremism" Report "Imperative," says Dem Congresswoman*, PJ Media (Apr. 8, 2018), https://pjmedia.com/news-and-politics/total-retraction-fbis-black-identity-extremism-report-imperative-says-dem-congresswoman/.

27. Members of Congress continue to demand that the FBI explain the basis for the Assessment and its purpose and impact. On June 4, 2019, the House Oversight Subcommittee on Civil Rights and Civil Liberties held the second hearing in a series entitled: "Confronting White Supremacy."[24] Representative Ayanna Pressley questioned the director of the FBI's Counterterrorism Division on what she called "this absurd designation."[25] The FBI Counterterrorism Division director testified that the term "Black Identity Extremists" no longer "exist[s]" and that the FBI has been unable to link a single killing to Black Lives Matter or similar Black activists groups.[26]

28. On July 17, 2019, a delegation of Black-led organizations delivered a letter and petition signed by over 100,000 people and twenty-three organizations to the leadership of three committees of the U.S. House of Representatives urging "immediate action" to end the targeting of Black activists through the "Black Identity Extremist" designation and other threat designations.[27] The letter urged these members of Congress to "[r]equire the FBI and other agencies to revoke BIE and similar designations[,] and to institute reforms to prevent improper targeting based on race, other protected characteristics, and/or speech," to "[f]ully investigate and make public all documents related to" the BIE and other similar designations, and to "[h]ost congressional hearings" on the steps taken "to revoke the designations."[28]

---

[24] Harriot, *supra* note 9.

[25] Hannah Allam, *5 Takeaways About The Trump Administration's Response To Far-Right Extremism,* NPR (June 7, 2019), https://www.npr.org/2019/06/07/730346019/5-takeaways-about-the-trump-administrations-response-to-far-right-extremism.

[26] *See* Harriot, *supra* note 9; Alice Speri, *Fear of a Black Homeland: The Strange Tale of the FBI's Fictional "Black Identity Extremisms Movement,"* The Intercept (Mar. 23, 2019, 8:31 AM), https://theintercept.com/2019/03/23/black-identity-extremist-fbi-domestic-terrorism/.

[27] Press Release, MediaJustice, Black Activists Meet with Congress to Demand Transparency Around FBI Surveillance (July 17, 2019), https://mediajustice.org/news/black-activists-meet-with-congress-to-demand-transparency-around-fbi-surveillance/.

[28] Letter from MediaJustice et al., to The Honorable Elijah Cummings, Chairman, U.S. House

29. On July 23, 2019, the U.S. Senate Committee on the Judiciary convened an FBI oversight hearing during which committee members demanded that Director Wray explain the FBI's decision to jettison the "Black Identity Extremist" designation and other designations once used to track violent extremism with the single, broader designation of "racially motivated violent extremism."[29] Senator Richard Durbin expressed alarm that a growing trend in violence perpetrated by white supremacists, both domestically and internationally, "is not being taken as seriously" by the FBI. At no point during the hearing did Director Wray confirm that the FBI has formally rescinded the term "Black Identity Extremist," the Assessment that created the designation, or any related materials. Nor did he call for an end of the targeting of Black people and Black-led organizations or acknowledge the harm that the BIE designation has had on these communities.

30. On August 8, 2019, FBI documents leaked to The Young Turks revealed that the FBI implemented a program, titled "IRON FIST," to target its resources against so-called "Black Identity Extremists."[30] The leaked documents describe IRON FIST as "designed to evolve and adapt to the ever-changing threat posed by [Black Identity Extremism], [and] to proactively address this priorty domestic terrorism target by focusing FBI operations via enhanced intelligence collection efforts."[31] They also reveal that the FBI did not revoke the "Black Identity Extremist" designation, but that the FBI instead simply renamed the label to "Black Racially Motivated Extremism," which was

---

Oversight & Reform Committee, The Honorable Jerry Nadler, Chairman, U.S. House Judiciary Committee, & The Honorable Bennie G. Thompson, Chairman, U.S. House Homeland Security Committee (July 17, 2019), https://mediajustice.org/wp-content/uploads/2019/07/ProtectBlackDissent-July-Hill-Advocacy-Day-Sign-On-Letter.pdf.

[29] Byron Tau, *FBI Abandons Use of the Term 'Black Identity Extremism,'* Wall Street Journal (July 23, 2019, 10:33 PM), https://www.wsj.com/articles/fbi-abandons-use-of-terms-black-identity-extremism-11563921355.

[30] Ken Klippenstein, *Leaked FBI Documents Reveal Bureau's Priorities Under Trump*, The Young Turks (Aug. 8, 2019), https://tyt.com/stories/4vZLCHuQrYE4uKagy0oyMA/mnzAKMpdtiZ7AcYLd5cRR.

[31] *Id.*

-13-
SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF
No. 4:19-cv-01465 (DMR)

identified as a counterterrorism priority for 2020 under the new umbrella term "Racially Motivated Violent Extremism."[32]

31. This latest leak of documents about the FBI's targeting of Black people on the basis of a purported shared ideology has further fueled public concern that the FBI wastes resources targeting Black activists and Black-led organizations at the expense of addressing violence by white supremacists, including recent mass shootings targeting people of color.[33] One organization cited the leak as proof that the FBI "treat[s] white supremacist violence as a less serious concern than an imaginary Black Identity Extremist movement."[34]

32. Despite continuing concern by the public, media, and members of Congress that the BIE designation is harmful, the FBI Director has not revoked the "Black Identity Extremist" threat designation, similar threat designations targeting Black people, the Assessment that created the BIE label, or all of the policy documents, guidelines, and training materials used to implement the BIE designation. Nor has the FBI Director indicated that all programs used to implement the BIE designation have been terminated.

33. Because of the continued and significant public interest in exposing the basis of the Assessment as well as its consequences, which include improper government surveillance of Black people and Black-led organizations, Plaintiffs seek the immediate searching, processing,

---

[32] *Id.*

[33] *See, e.g.*, Igor Derysh, *Leaked Documents Show FBI Targeted Post-Ferguson "Black Identity Extremists" Over White Supremacists*, Salon (Aug. 14, 2019), https://www.salon.com/2019/08/14/leaked-documents-show-fbi-targeted-post-ferguson-black-identity-extremists-over-white-supremacists/; Anne Branigin, *Florida White Supremacist Arrested for Plot to Shoot Up Walmart; FBI Still Fixated on 'Black Identity Extremists,'* The Root (Aug. 11, 2019), https://www.theroot.com/florida-white-supremacist-arrested-for-plot-to-shoot-up-1837146937; Benjamin Fearnow, *FBI Ranks 'Black Identity Extremists' Bigger Threat than Al Qaeda, White Supremacists: Leaked Documents*, Newsweek (Aug. 8, 2019), https://www.newsweek.com/fbi-leak-black-identity-extremist-threat-1453362.

[34] Mike German, *The FBI Could Fight Far-Right Violence If They Wanted to–But They Don't*, The Guardian (Aug. 16, 2019), https://www.theguardian.com/commentisfree/2019/aug/15/far-right-violence-fbi-terrorism-hate-crime.

and release of documents related to the Assessment. Only through access to these records can the public exercise its indispensable role in checking the vast powers of our government, including impermissible racial profiling and targeting of Black people and Black-led organizations on the basis of speech, association, or conduct protected by the First Amendment.

## THE FOIA REQUESTS

34. On October 31, 2018, Plaintiffs submitted a request under the FOIA, 5 U.S.C. § 552, and the DOJ implementing regulations, 28 C.F.R. § 16.1, to Defendant FBI requesting records pertaining to the FBI's surveillance of Black people on the basis of a purported shared ideology.

35. The 2018 Request seeks three categories of records: (1) all records created since January 1, 2014, that use any of the following terms or abbreviations: "Black Identity Extremist" ("BIE"), "Black Nationalist" ("BN"), "Black Separatist" ("BS"), or "Black Supremacist Extremists" ("BSE"), Exhibit A at 5 (paragraph 1); (2) all records referencing, or created in response to, public and Congressional inquiries or reactions to the existence or contents of the FBI Intelligence Assessment titled "Black Identity Extremists Likely Motivated to Target Law Enforcement Officers," Exhibit A at 5 (paragraph 2); and (3) all records created since January 1, 2014, that reference "extremist" violence committed by Black people in the United States, including but not limited to individuals described as "Black Identity Extremists," "Black Nationalists," "Black Separatist Extremists," "Black Separatists," or "Black Supremacist Extremists," Exhibit A at 5 (paragraph 3).

36. On June 25, 2019, Plaintiff's submitted an additional request under the FOIA and the implementing regulations to Defendant FBI seeking the same three categories of records but limited in scope to records created between April 19, 2019 and June 19, 2019.

## AGENCY RESPONSE

37. The FBI assigned two separate request numbers to two of the three record categories identified in the 2018 Request, and responded in two separate letters, each dated November 2, 2018. *See* Exhibit B (responding to paragraph 1 (Request No. NFP-102340)); Exhibit C (responding to

paragraph 3 (Request No. NFP-102341)) (collectively, the "Responses"). The FBI refused to search for records responsive to paragraphs 1 and 3 of the 2018 Request, asserting that the 2018 Request "does not contain enough descriptive information to permit a search." *See* Exhibit B at 1; Exhibit C at 1.

38. Plaintiffs received no response from Defendants to paragraph 2 of the 2018 Request, which seeks records related to public and Congressional inquiries or reactions to the existence or contents of the Assessment.

39. On February 22, 2019, Plaintiffs received a cover letter dated February 15, 2019, and an initial disclosure of heavily redacted records from Defendant FBI. *See* Exhibit D (responding to Request No. 1387511-000)). The FBI's cover letter did not directly reference any paragraph or category of record identified in the 2018 Request. Instead, the FBI's cover letter indicated that the disclosure sought to respond to an earlier FOIA request to the FBI submitted by Plaintiffs in October 2017, which sought substantially similar information as paragraph 2 of the 2018 Request, albeit limited to an earlier period of time.[35] The FBI's cover letter indicated that the agency reviewed 552 pages of documents and released 320 pages with information redacted under the FOIA Exemptions 5, 6, 7C, and 7E. *Id*. Neither the FBI's cover letter nor the disclosure itself provide any description of the withheld information sufficient to permit Plaintiffs to determine whether Defendants have properly withheld information under the specified FOIA exemptions.

40. Plaintiffs received a second cover letter dated March 15, 2019, and a "final release" of heavily redacted records from Defendant FBI. *See* Exhibit E (responding to Request No. 1387511-000)). The FBI's cover letter, again, did not directly reference any paragraph or category of records identified in the 2018 Request. Instead, the FBI's cover letter indicated that the disclosure was a final response to the October 2017 FOIA request submitted by Plaintiffs in October 2017, which sought similar information, but limited to an earlier time period. The FBI's

---

[35] Plaintiffs' October 2017 request under the FOIA is not at issue in this litigation.

cover letter indicated that the agency reviewed 203 pages of documents and released 156 pages with information redacted under the FOIA Exemptions 5, 6, 7A, 7C, and 7E. *Id*. Neither the FBI's cover letter nor the disclosure itself provide any description of the withheld information sufficient to permit Plaintiffs to determine whether Defendants have properly withheld information under the specified FOIA exemptions.

41. Defendants have provided any response to Plaintiffs' 2019 Request. Nor have Defendants disclosed any records sought by the 2019 Request.

42. Defendants are thus improperly withholding records sought by Plaintiffs that are urgently needed to inform public debate concerning unlawful FBI targeting of Black people and Black-led organizations for surveillance, investigation, and prosecution.

**EXHAUSTION**

43. Plaintiffs have exhausted all applicable administrative remedies with respect to paragraphs 1, 2, and 3 of the 2018 Request.

44. By letter dated January 22, 2019, Plaintiffs filed a timely administrative appeal with the DOJ's Office of Information Policy challenging the FBI's failure to adequately search for records reasonably described in paragraphs 1 and 3 of the 2018 Request; its failure to make those records promptly available; and the FBI's improper withholding of those documents. To date, the FBI has failed to respond to the appeal.

45. Because the FBI has provided no response to paragraph 2 of the 2018 Request, the FBI has constructively denied Plaintiffs the information sought in that paragraph.

46. To the extent the FBI sought to respond to paragraph 2 of the 2018 Request through the February 15, 2019 and March 15, 2019 disclosures, these disclosures are heavily redacted and provide insufficient information to determine whether any of the redacted information and withheld documents are properly kept secret under the FOIA. Defendants have not provided any explanation for why exemptions to the FOIA permit withholding information from these disclosures.

47. Additionally, the FBI's February 15, 2019 and March 15, 2019 disclosures—to the extent they seek to respond to paragraph 2 of the 2018 Request—appear to be deficient on their face.

Media reports detailed above show that the Congressional Black Caucus held a March 2018 hearing during which members of Congress raised concerns about the Assessment and government surveillance and investigations conducted under the so-called BIE designation. Similarly, media reported that the House Oversight Subcommittee on Civil Rights and Civil Liberties held a June 2019 hearing on "Confronting White Supremacy" at which legislators questioned an FBI official about the "BIE" designation.[36] The FBI's disclosures, however, only include e-mails between FBI and DOJ officials that were exchanged between October and November 2017. The absence of any internal e-mails or other agency records dated around the time of the March 2018 Congressional Black Caucus hearing and the June 2019 hearing raises serious concerns that the FBI is improperly withholding public records responsive to Plaintiffs' request for information related to public and Congressional inquiries or reactions to the Assessment.

48. By letters dated March 14, 2019 and April 4, 2019, Plaintiffs filed timely administrative appeals of the the FBI's disclosures from February 15, 2019 and March 15, 2019 with the DOJ's Office of Information Policy. Plaintiffs challenged the FBI's failure to conduct a proper search for responsive documents; its failure to to make those records promptly available; its improper withholding of those documents; its failure to expedite processing of responsive documents; and its failure to waive search fees. With exception of Plaintiffs' request for expedited processing, which the FBI denied, the FBI has failed to respond to the appeal as of the date of this filing.

49. Plaintiffs have also exhausted all applicable administrative remedies with respect to paragraphs 1, 2, and 3 of the 2019 Request.

50. Because Defendants entirely failed to respond to Plaintiffs' 2019 Request, whether through a substantive response or the disclosure of documents, Defendant has constructively

---

[36] Harriot, *supra* note 9.

denied the 2019 Request. Plaintiffs' administrative remedies are thus exhausted for the 2019 Request as well.

## CAUSE OF ACTION

51. Plaintiffs are entitled to injunctive relief with respect to the release and disclosure of the requested documents under 5 U.S.C. § 552(a)(4)(B) because the FBI continues to improperly deny the processing of agency records in violation of the FOIA. Plaintiffs will also suffer irreparable injury from, and have no adequate legal remedy for, the FBI's illegal withholding of, and prolonged delay in, production of government documents pertaining to the FBI's Assessment and surveillance of Black people, including activists and Black-led organizations.

52. Defendants' failure to conduct a proper search for records responsive to the Requests violates the FOIA, 5 U.S.C. § 552(a)(3)(C)–(D), and the corresponding agency regulations, 28 C.F.R. § 16.4(a).

53. Defendants' failure to release records responsive to Plaintiffs' Requests violates the FOIA, 5 U.S.C. § 552(a), and the corresponding agency regulations, 28 C.F.R. § 16.1.

54. Defendants' failure to timely respond to Plaintiffs' Requests, including by failing to make a timely determination as each request, violates the FOIA, 5 U.S.C. § 552(a)(6)(A), and the corresponding agency regulations, 28 C.F.R. § 16.6(b).

55. Defendants' failure to make promptly available the records sought by Plaintiffs' Requests violates the FOIA, 5 U.S.C. § 552(a)(3)(A), and the corresponding agency regulations, 28 C.F.R. § 16.6(b).

56. Defendants' improper withholding of information violates the FOIA, 5 U.S.C. § 552(a)(4)(B).

57. Defendants' failure to expedite processing of responsive records violates the FOIA, 5 U.S.C. § 552(a)(6)(E), and corresponding agency regulations, 28 C.F.R. § 16.5(e).

58. Defendants' failure to waive search fees violates the FOIA, 5 U.S.C. § 522(a)(4)(A)(ii)-(iii), and the corresponding agency regulations, 28 C.F.R. § 16.10(k).

**REQUEST FOR RELIEF**

Plaintiffs respectfully request that this Court:

    A.    Order Defendants to conduct a thorough search for all responsive records;

    B.    Order Defendants to immediately process all requested records;

    C.    Order Defendants to promptly disclose the requested records in their entirety and to make copies available to Plaintiffs;

    D.    Enjoin Defendants from charging Plaintiffs fees for processing the Requests;

    E.    Enter a preliminary and permanent injunction against Defendants ordering the requested relief herein;

    F.    Award Plaintiffs their litigation costs and reasonable attorneys' fees incurred in this action; and

    G.    Grant such other relief as the Court may deem just and proper.

Dated: August 21, 2019

Respectfully Submitted,

  */s/ Nusrat J. Choudhury*
Nusrat J. Choudhury

Christine P. Sun (SBN 218701)
Abre' Leann Conner (SBN 306024)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
OF NORTHERN CALIFORNIA, INC.
39 Drumm Street
San Francisco, California 94111
T: (415) 621-2493
F: (415) 255-8437
*csun@aclunc.org*
aconner@aclunc.org

Mark J. Carter
Hugh Handeyside
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street—18th Floor
New York, New York 10004
T: (212) 549-2500
F: (212) 549-2654
*nchoudhury@aclu.org*
*mcarter@aclu.org*
*hhandeyside@aclu.org*

*Attorneys for Plaintiffs*

-20-
SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF
No. 4:19-cv-01465 (DMR)